ALLIANCE, AFSCME/SEIU, AFL-CIO vs. SECRETARY OF
ADMINISTRATION & others[1]
(and two companion cases[2]).

Suffolk. May 5, 1992. - August 13, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

Constitutional Law, Appropriation of money. Governor. General Court. Commonwealth, Collective bargaining, Financial matters. Labor, Public employment, Collective bargaining. Public Employment, Collective bargaining.

Discussion of the enactment process with respect to the constitutional powers of the Governor and roles of the Governor and Legislature in relation to appropriations. [381-382]

In circumstances where the Legislature, at the request of the Governor, appropriated money to fund certain collective bargaining agreements but the Governor did not approve the bills or acquiesce in them and the Legislature did not override the Governor's veto, the funding bills were not enacted and the appropriation was without effect. [382-384]

Article 63, § 5, of the Amendments to the Massachusetts Constitution, granting the Governor selective veto power over appropriation bills, does not supplant or limit the Governor's unitary veto power granted in Part II, c. 1, § 1, art. 2, of the Massachusetts Constitution or his broad power to make recommendations on legislation granted by art. 56 of the Amendments to the Massachusetts Constitution. [384-385]

---

[1]The Treasurer and Receiver General and the Commonwealth. The Governor is also named as a defendant, but declaratory relief is not available against the Governor. See G. L. c. 231A, § 2 (1990 ed.); Rice v. The Governor, 207 Mass. 577, 580 (1911). We therefore order the Governor dismissed as a party. See Powers v. Secretary of Admin., 412 Mass. 119, 119 n.2 (1992); Barnes v. Secretary of Admin., 411 Mass. 822, 822 n.2 (1992).

[2]Massachusetts Organization of State Engineers & Scientists & others vs. Commonwealth; National Association of Government Employees, Inc. vs. Commonwealth & others.

We acknowledge the amicus brief of the Joint Council No. 10 of the International Brotherhood of Teamsters, AFL-CIO, on behalf of the plaintiffs.

There was no merit to State employees' unions' claims that collective bargaining agreements became effective when signed merely because there were sufficient funds in the general appropriations enactment for that fiscal year, where no appropriation was enacted to fund the agreements after their execution, as G. L. c. 150E, § 7, contemplates. [385-386]

Where collective bargaining agreements remained unfunded by a validly enacted appropriation and thus did not become legally binding State contracts, no claims premised on deprivation of contractual and statutory rights under the agreements could be supported. [386]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on January 22, 1992, and January 29, 1992, respectively.

CIVIL ACTION commenced in the Superior Court Department on January 8, 1992.

The cases were consolidated in the Supreme Judicial Court for the county of Suffolk and were reported by *Wilkins, J.,* on a statement of agreed facts.

*Ruth A. Bourquin* (*Carol R. Golubock* of the District of Columbia, & *David B. Rome* with her) for Alliance, AFSCME/SEIU, AFL-CIO.

*Mark Dalton* (*Matthew J. Buckley* with him) for National Association of Government Employees, Inc., & others.

*Nathan S. Paven* for Massachusetts Organization of State Engineers & Scientists.

*Peter Sacks,* Assistant Attorney General, for the defendants.

*James T. Grady & Christina C. Duddy,* for Joint Council No. 10 of the International Brotherhood of Teamsters, AFL-CIO, amicus curiae, submitted a brief.

LYNCH, J. In these consolidated actions the plaintiffs, three State employee labor unions (unions),[3] seek a declaration

---

[3]The Alliance, AFSCME/SEIU, AFL-CIO (Alliance) represents State employees in collective bargaining units 2, 8, and 10; the Massachusetts Organization of State Engineers & Scientists (MOSES) represents unit 9; and the National Association of Government Employees, Inc. (NAGE) represents units 1, 3, and 6.

On January 22, 1992, the Alliance filed its complaint in the Supreme Judicial Court for Suffolk County. On January 29, 1992, MOSES filed a

under G. L. c. 231A, § 2 (1990 ed.), that the various wage increases and other cost items contained in certain collective bargaining agreements with the Commonwealth are enforceable. Two of the unions also seek mandatory relief requiring the defendants to take all steps necessary to pay the wage increases, even without any legally effective appropriations. The cases are here on reservation and report by a single justice based on the plaintiffs' complaints, the defendants' motion to dismiss, and the parties' statement of agreed facts. We conclude that the increases have not become effective and are not enforceable.

1. *Facts*. We summarize the statement of agreed facts as follows: After negotiations between the unions and the Commonwealth, five collective bargaining agreements were executed on December 15, 1990, and January 2, 1991, in the final days of the administration of the outgoing Governor.[4] The then Secretary of Administration signed the collective bargaining agreements on behalf of the Commonwealth, and the Alliance, MOSES, and NAGE signed the agreements on behalf of their respective collective bargaining units. All the contracts are for the period July 1, 1990, through June 30, 1993, and called for a thirteen per cent wage increase to be phased in over the course of three years and for increases in various payroll costs such as shift differentials, weekend differentials, and employer contributions to the health and welfare fund. Each agreement contained an article entitled "Appropriation by the General Court," which included the following: "The cost items contained in this Agreement shall not become effective unless appropriations necessary to fully

---

separate complaint in the county court. On February 11, 1992, the defendants moved to dismiss the complaints. On February 12, 1992, the NAGE action in the Superior Court for Suffolk County was transferred to the county court. However, on March 3, 1992, the parties filed a joint statement of agreed facts. On March 4, 1992, a single justice of this court reserved and reported the cases.

[4]The Alliance and MOSES executed one agreement each. NAGE negotiated and executed three separate agreements on behalf of its bargaining units.

fund the cost items have been enacted by the General Court in accordance with M.G.L. c. 150E, section 7."[5]

On February 1, 1991, the Governor submitted five bills to the Legislature requesting appropriations to fund the wage and cost item increases for fiscal year 1991 (FY 1991), the first year of the agreements.[6] The Governor also sent a written message to the Legislature urging that the bills be rejected "[i]n light of the extraordinarily difficult fiscal circumstances now facing the Commonwealth, for both the current fiscal year and the ensuing one, and in light of other significant cost items for existing employee benefits which the Administration did not negotiate and cannot support and which would be continued under the recently signed agreements."

On December 17, 1991, the House, and on December 20, the Senate, approved the bills which were then laid before the Governor. On December 30, 1991, the day the Legislature was to adjourn, the Governor returned the bills to the Legislature unsigned. Accompanying each bill was a message noting the financial problems of the Commonwealth and that the agreements' provisions for wage increases were "not in any way performance based which is the philosophy" of the current administration. Additionally, the Governor asked the Legislature to amend the bills to provide that funding the first year of the agreements would not make them effective

---

[5]For example, art. 30 of the Alliance agreement states: "The cost items contained in this Agreement shall not become effective unless appropriations necessary to fully fund such cost items have been enacted by the General Court in accordance with M.G.L. c. 150E, section 7, in which case, the cost items shall be effective on the date provided in the Agreement. The employer shall make such request of the General Court. If the General Court rejects the request to fund the Agreement, the cost items shall be returned to the parties for further bargaining."

[6]The five appropriation bills are House Nos. 5003, 5004, 5005, 5006, and 5007. House No. 5007 was to fund the cost items contained in the agreement with the Alliance on behalf of units 2, 8, and 10. House No. 5003 was to fund the cost items in the agreement with NAGE on behalf of unit 6; House No. 5005 was to fund the cost items of the agreement with NAGE on behalf of unit 3; House No. 5006 was to fund the cost items of the agreement with NAGE on behalf of unit 1. House Bill No. 5004 was to fund the cost items in the agreement with MOSES covering unit 9.

for the entire three-year term, and he also proposed that G. L. c. 150E (1990 ed.), be amended to relieve a successor employer from the obligation to abide by and secure funding for a collective bargaining agreement negotiated by a predecessor.[7]

The Legislature adjourned without taking further action on the bills.

The unions contend that the cost items, specifically the wage increases, became effective once the Legislature "passed" the bills approving the funding, notwithstanding the Governor's refusal to sign the bills, because the bills were "enacted" in the sense required by G. L. c. 150E, § 7, and the agreements. The unions claim that, even if the Governor's signature was necessary, he was statutorily and contractually obligated to sign the bills. The unions also argue that the increases became effective as soon as the agreements were executed, and that the subsequent submission and passage of the appropriation bills was not necessary, because the general appropriations act for FY 1991, which was in effect,

---

[7]The Governor proposed to amend the bills by adding the following two sections:

"Section 4. Provided further that notwithstanding any general or special law to the contrary, including but not limited to the provisions of section seven of chapter one hundred and fifty E, the appropriation contained herein shall be for cost items for fiscal year nineteen hundred and ninety-one only and all cost items for fiscal years nineteen hundred and ninety-two and nineteen hundred and ninety-three are hereby duly rejected and returned to the parties for further bargaining.

"Section 5. Paragraph (b) of section 7 of chapter one hundred and fifty E of the General Laws, as appearing in the 1990 Official Edition, is hereby amended by striking in line 17 the word 'bargaining' and inserting in place thereof 'bargaining; provided further that an appropriation funding the cost items for the first year of a collective bargaining agreement does not constitute an approval by the legislative body to fund cost items for the entire term of the agreement; provided further, if the appropriation process is not completed prior to a successor executive taking office, and could not be completed without the successor executive performing some ministerial or discretionary act — including but not limited to submitting to the appropriate legislative body a request for the appropriation or signing the final appropriation bill — then the cost items of said agreement shall be automatically returned to the parties for further bargaining.' "

already contained sufficient funding for the increases. We do not agree.[8]

2. *Analysis*. The unions misunderstand the enactment process, the constitutional powers of the Governor, and the roles of the Governor and Legislature in relation to appropriations.

The power to appropriate money is exclusively that of the Legislature. *Bromfield* v. *Treasurer & Receiver Gen.*, 390 Mass. 665, 670 n.9 (1983). *Opinion of the Justices*, 302 Mass. 605, 612, 616 (1939). The Governor, however, has the power to disapprove an appropriation entirely. *Barnes* v. *Secretary of Admin.*, 411 Mass. 822, 826 (1992). *Opinion of the Justices*, 294 Mass. 616, 620 (1936). Furthermore, although the words "enact" and "enacted" in art. 63, §§ 3 and 4, of the Amendments to the Massachusetts Constitution, refer solely to legislative action, see *Opinion of the Justices*, 300 Mass. 630, 640 (1938), "those words . . . are also used to indicate not only action by the Legislature but also approval by the Governor." *Opinion of the Justices*, 370 Mass. 869, 872 (1976). "Our system contemplates action by both the legislative and executive branches before a bill may be enacted into law." *Opinion of the Justices*, 384 Mass. 840, 844-845 (1981). Accordingly, a bill may become law only with the Governor's approval by signature, by his acquiescence, or by a legislative override of his veto. *Tuttle* v. *Boston*, 215 Mass. 57, 59 (1913). The governing statute, G. L. c. 150E, § 7, and the agreements themselves recognize the necessity for a valid appropriation to fund the cost items of the agreements. The public employment practices of the Commonwealth similarly require both legislative and executive action to fund collective bargaining agreements on a local level as well. See *Labor Relations Comm'n* v. *Selectmen of Dracut*, 374 Mass. 619 (1978). The unions, therefore, cannot prevail in the absence of a valid appropriation. Chapter 150E does not eliminate the need for the Governor's signature on an appropriation bill. Even where, as here, the Governor pro-

---

[8]For ease of discussion, all arguments have been treated as if jointly raised by the unions.

poses the bill, the Governor's approval of the bill cannot be presumed, nor can presentment to the Governor be dispensed with as a mere formality. *Opinion of the Justices,* 375 Mass. 827, 838 (1978). Since an appropriation requires gubernatorial and legislative action, there have been no "appropriations . . . to fully fund the cost items" since there has been no appropriation bill enacted into law to fund those items.

In arguing to the contrary the unions seek to fractionalize the law-making process by claiming that the funding bills were "enacted" absent gubernatorial action or that the acts of a previous administration somehow impinged on the constitutionally mandated discretion of the next. We decline to adopt such a strained and constitutionally questionable interpretation of the statute and the agreements. Both required the Governor to submit an appropriation request to the Legislature, but the request for legislative action is not a substitute for exercise of the Governor's independent prerogatives. See *Labor Relations Comm'n* v. *Selectmen of Dracut, supra* at 626. See also *Boston Teachers Union, Local 66* v. *School Comm. of Boston,* 370 Mass. 455, 474-475 (1976). The Governor was not required to sign the appropriation bills nor could he have been since the act of signing is a constitutionally granted discretionary power. See Part II, c. 1, § 1, art. 2, of the Massachusetts Constitution, as amended by art. 90, § 1, of the Amendments; art. 63, § 5, of the Amendments to the Massachusetts Constitution, as amended by art. 90, § 4, of the Amendments; art. 56 of the Amendments to the Massachusetts Constitution, as amended by art. 90, § 3, of the Amendments.[9] Obviously, when the Governor returned to the

---

[9] The power to reduce or to disapprove items in an appropriation bill, or to amend, or to sign or not to sign any bill, including an appropriation bill, derives from the Constitution and cannot be abrogated by legislation. Art. 63, § 5. Cf. *Pineo* v. *Executive Council,* 412 Mass. 31, 35 (1992). Therefore, G. L. c. 150E cannot constrain or infringe on these constitutional powers of the Governor. Furthermore, a predecessor Governor cannot abrogate the constitutional powers of a successor Governor. See *Paisner* v. *Attorney Gen.,* 390 Mass. 593, 600 (1983); *Dinan* v. *Swig,* 223 Mass. 516, 517, 519 (1916). Similarly, one Legislature cannot bind itself or a successor Legislature to make an appropriation since the power to appropriate

Legislature the unsigned bills with amendments, he did not approve those bills. Because the Governor neither signed the funding bills nor acquiesced in them, and since there has been no legislative override, no appropriation was enacted into law. Consequently, there was no appropriation to fund the cost items of the agreements and the cost items never became effective.

There is also no basis to the unions' claim that the appropriation bills became law because art. 56 did not authorize the Governor to return them to the Legislature. "It is a fundamental principle of constitutional construction that every word and phrase in the Constitution was intended and has meaning." *Powers* v. *Secretary of Admin.*, 412 Mass. 119, 124 (1992). "Words occurring in different places in the Constitution and its amendments ordinarily should be given the same meaning unless manifestly used in different senses." *Raymer* v. *Tax Comm'r*, 239 Mass. 410, 412 (1921). Although art. 63, § 5, specifically grants the Governor a selective veto power over appropriation bills,[10] see *Opinion of the Justices*, 375 Mass. 827, 834 (1978), there is nothing in that amendment, or in any other, that suggests that the broad powers conferred on the Governor under art. 56 are inapplicable to appropriation bills or that art. 63 is the exclusive

---

derives from the Constitution. *Opinion of the Justices*, 302 Mass. 605, 610-611 (1939). *Opinion of the Justices*, 294 Mass. 616, 622 (1936).

We also note that this court cannot compel an appropriation without violating art. 30 of the Declaration of Rights. *Bromfield* v. *Treasurer & Receiver Gen.*, 390 Mass. 665, 670 n.9 (1983).

[10]"The governor may disapprove or reduce items or parts of items in any bill appropriating money. So much of such bill as he approves shall upon his signing the same become law. As to each item disapproved or reduced, he shall transmit to the house in which the bill originated his reason for such disapproval or reduction, and the procedure shall then be the same as in the case of a bill disapproved as a whole. In case he shall fail so to transmit his reasons for such disapproval or reduction within ten days after the bill shall have been presented to him, such items shall have the force of law unless the general court by adjournment shall prevent such transmission, in which case they shall not be law." Article 63, § 5, of the Amendments to the Massachusetts Constitution, as amended by art. 90, § 4, of the Amendments.

constitutional provision applicable to appropriation bills. Rather, art. 56 grants the Governor the right to return *any* bill or resolve and does not except appropriation bills.[11] Moreover, the item veto power under art. 63 is an essential gubernatorial check on the legislative power of appropriation and was intended to supplement, rather than supplant, the Governor's unitary veto power granted in Part II, c. 1, § 1, art. 2, of the Massachusetts Constitution.[12] *Opinion of the Justices*, 384 Mass. 820, 824 (1981). Considering the similarly broad language of Part II, c. 1, § 1, art. 2, it follows that art. 63 also does not supplant or limit art. 56. We therefore conclude that the Governor, as he did in this case, may return any bill, and he may recommend any amendment or amendments to any bill, including appropriation bills.

Likewise, there is no merit to the unions' claim that the cost items became effective when the agreements were signed because, as they argue, there were sufficient funds in the general appropriations act of FY 1991. The language of the agreements referencing G. L. c. 150E, § 7, and obligating the Governor to request appropriations from the Legislature

---

[11]"The governor, within ten days after any bill or resolve shall have been laid before him, shall have the right to return it to the branch of the general court in which it originated with a recommendation that any amendment or amendments specified by him be made therein. Such bill or resolve shall thereupon be before the general court and subject to amendment and re-enactment. If such bill or resolve is re-enacted in any form it shall again be laid before the governor for his action, but he shall have no right to return the same a second time with a recommendation to amend." Article 56 of the Amendments to the Massachusetts Constitution, as amended by art. 90, § 3, of the Amendments.

[12]"No bill or resolve of the senate or house of representatives shall become a law, and have force as such, until it shall have been laid before the governor for his revisal; and if he, upon such revision, approve thereof he shall signify his approbation by signing the same. But if he have any objection to the passing of such bill or resolve, he shall return the same, together with his objections thereto, in writing, to the senate or house of representatives, in whichsoever the same shall have originated . . . . And in order to prevent unnecessary delays, if any bill or resolve shall not be returned by the governor within ten days after it shall have been presented, the same shall have the force of a law." Part II, c. 1, § 1, art. 2, of the Massachusetts Constitution, as amended by art. 90, § 1, of the Amendments.

clearly contemplates appropriations subsequent to the execution of the agreements in order to fund the cost items. See G. L. c. 150E, § 7 (*b*), which clearly envisions appropriations enacted "after the . . . agreement is executed." Neither is there any reference to funding from a general appropriation nor is there a single line item in the budget of FY 1991 devoted to funding the agreements. There has been no "appropriation" as that term is used in the contracts and as has been hereinabove explained.[13]

The unions' claim of due process violations under 42 U.S.C. § 1983 (1988) and the Fourteenth Amendment to the United States Constitution, as well as arts. 1, 10, and 12 of the Massachusetts Declaration of Rights also fails. These claims are premised on a deprivation of contractual and statutory rights and presume the effectiveness of the cost items. As discussed above, the cost items remain unfunded and have never been given legally binding effect. Therefore, the rights the unions have under the contract and the statute have not been violated.

In conclusion, we direct that a judgment enter in the Supreme Judicial Court for the county of Suffolk declaring that the cost items have never become effective and dismissing the plaintiffs' other claims for relief.

*So ordered.*

---

[13]We also reject the unions' argument that a reduction in the workforce in each of the unions has resulted in sufficient FY 1991 general appropriations to fund the cost items. The agreements do not provide for funding from any such reduction.