434 Mass. 651 (2001)                                651

Teamsters Local Union No. 404 *v.* Secretary of Administration & Finance.

TEAMSTERS LOCAL UNION No. 404 *vs.* SECRETARY OF
ADMINISTRATION & FINANCE & others.[1]

Suffolk. May 7, 2001. - July 19, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Labor,* Collective bargaining, Public employment. *Public Employment,* Collective bargaining. *Unlawful Interference. Sheriff. Governor. Practice, Civil,* Affidavit, Deposition.

This court concluded that, where the Governor may enlist the aid of his subordinates in deciding whether to recommend that the Legislature appropriate funds for collective bargaining agreements, and may communicate the views of the administration during the negotiation process, such communications do not constitute unlawful interference with a union's collective bargaining rights under G. L. c. 150E during negotiations between a county sheriff and the union in its representation of correction officers and other professionals at a county jail and house of correction. [654-659]

In a civil action, the judge did not err in denying the plaintiff's motion to strike an affidavit, offered by the defendants, of a witness who was unavailable for a deposition prior to the discovery deadline, where the plaintiff failed to show that the defendants "engaged in a conscious strategy designed to . . . frustrate the process of the litigation"; further, where it was not possible to file the affidavit within the confines of Rule 9A of the Rules of the Superior Court (2001) due to circumstances beyond the defendants' control, the judge's decision to consider a motion for summary judgment despite the rule 9A violation was within his discretion. [659-661]

CIVIL ACTION commenced in the Superior Court Department on January 29, 1999.

The case was heard by *John M. Xifaras,* J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Matthew E. Dwyer (Joseph A. DeTraglia* with him) for the plaintiff.

---

[1] Personnel administrator of the human resources division of the Executive Office for Administration and Finance, the director of the office of employee relations, and the sheriff of Franklin County.

*Daniel J. Hammond*, Assistant Attorney General, for the defendants.

IRELAND, J. The plaintiff union filed a complaint in the Superior Court seeking an order (1) declaring that the defendants unlawfully interfered with its collective bargaining rights under G. L. c. 150E; and (2) enjoining the defendants from interfering with its right to secure funding for a collective bargaining agreement executed between the union and the sheriff of Franklin County (sheriff). On cross motions for summary judgment, a Superior Court judge allowed the defendants' motion, ruling that they did not unlawfully interfere with the negotiations of the collective bargaining agreement. The union appealed and we transferred the case to this court on our own motion. We affirm the judgment of the Superior Court.

1. *Background.* The following facts are not disputed. The union serves as the exclusive bargaining agent for the approximately seventy-five correction officers and other professionals employed at the Franklin County jail and house of correction. Pursuant to St. 1996, c. 151, § 567 (*o*), and G. L. c. 150E, the sheriff is designated the "employer" of the bargaining unit represented by the union.[2]

In September, 1997, the sheriff and the union commenced negotiations with respect to a collective bargaining agreement. In October, the personnel administrator (administrator) of the human resources division (division) of the Executive Office for Administration and Finance (EOAF) requested that the sheriff temporarily suspend negotiations with the union until the administrator and the sheriff could have "the opportunity to meet and agree on parameters for those negotiations." The sheriff complied and the administrator and the sheriff met on October 30, 1997. At that meeting, the administrator reported the pay increase terms that would be acceptable to the Secretary of Administration and Finance (Secretary) and, ultimately, to

---

[2]The relevant portion of St. 1996, c. 151, § 567 (*o*), provides: "In the case of the employees of the Franklin county jail or house of correction in the custody and control of the sheriff of Franklin county, the employer, as defined in section one of chapter one hundred and fifty E of the General Laws, shall mean the sheriff of Franklin county or any individual who is designated to represent the sheriff and act in his interest in dealing with employees."

the Governor.[3] Thereafter, collective bargaining between the sheriff and the union resumed.

In January, 1998, the sheriff sent a letter to the administrator advocating an agreement providing for a pay increase in excess of that discussed during the October meeting. Later in the month, the sheriff sent another letter, similar in content, to the administrator. Neither letter asked the administrator to take any sort of action, and there was no response. However, in early spring, a division official informed one of the sheriff's subordinates that the pay increases reflected in the two letters "weren't going to fly." After several additional telephone calls, a meeting was scheduled between the sheriff and the administrator.

The day before the scheduled meeting, the sheriff and the union negotiated and signed a collective bargaining agreement containing the pay increase that the administrator previously had indicated was not acceptable. At the meeting, the sheriff informed the administrator that the agreement had been signed. The administrator reiterated that the pay increase was unacceptable.

One week later, the sheriff sent a copy of the executed bargaining agreement to the Governor, requesting that the agreement be submitted to the Legislature for appropriation, pursuant to G. L. c. 150E, § 7 (c).[4] Forty-five days after the Governor's receipt of the agreement, he had not submitted it to the

---

[3]The Secretary serves as a member of the Governor's cabinet and oversees the division, which the administrator heads. The Secretary is also referred to as the Commissioner of Administration and Finance. See, e.g., G. L. c. 6, § 183.

[4]The pertinent provision of G. L. c. 150E, § 7 (c), provides: "The provisions of this paragraph shall apply to . . . a county sheriff . . . . Every such employer shall submit to the governor, within thirty days after the date on which a collective bargaining agreement is executed by the parties, a request for an appropriation necessary to fund such incremental cost items contained therein as are required to be funded in the then current fiscal year . . . . Every such employer shall append to such request an estimate of the monies necessary to fund such incremental cost items contained therein as are required to be funded in each fiscal year, during the term of the agreement, subsequent to the fiscal year for which such request is made and shall submit to the general court within the aforesaid thirty days, a copy of such request and such appended estimate; provided, further, that every such employer shall append to such request copies of each said collective bargaining agreement, together

Legislature. Thus, according to the mandates of G. L. c. 150E, § 7 (*c*), the agreement was deemed rejected. In June, the administrator sent a letter to the sheriff, explaining the rationale for the disapproval of the proposed collective bargaining agreement, and he restated the acceptable terms and instructed the sheriff to return to the bargaining table for further negotiations.

2. *The collective bargaining agreement negotiations.* The union argues that the defendants' actions constitute unlawful interference with the statutory process established under G. L. c. 150E, § 7 (*c*), for the negotiation of collective bargaining agreements. We conclude that the Governor may enlist the aid of his subordinates in deciding whether to recommend that the Legislature appropriate funds for such agreements, and that the Governor and his subordinates may communicate the views of the administration during the negotiation process. Such communications do not constitute unlawful interference.

"General Laws c. 150E is a comprehensive scheme which governs the collective bargaining rights of public employees." *Boston Teachers Union, Local 66* v. *Boston*, 382 Mass. 553, 559 (1981). See *Boston Teachers Union, Local 66* v. *School Comm. of Boston*, 370 Mass. 455, 472-473 (1976). Specifically, G. L. c. 150E, § 7 (*c*), provides the framework for funding collective bargaining agreements between certain specified public employers, including county sheriffs.[5] Pursuant to § 7 (*c*), within thirty days of the execution of a collective bargaining agreement, the public employer must submit a request to the Governor for an appropriation to fund the agreement. The Governor may then recommend that the Legislature appropriate the requested funds. The Governor's failure to make this recommendation within forty-five days operates to veto the request,

with documentation and analyses of all changes to be made in the schedules of permanent and temporary positions required by said agreement. Whenever the governor shall have failed, within forty-five days from the date on which such request shall have been received by him, to recommend to the general court that the general court appropriate the monies so requested, the request shall be referred back to the parties for further bargaining."

[5]This provision differs from G. L. c. 150E, § 7 (*b*), where the employer is the Secretary (see G. L. c. 150E, § 1), and he submits the request for appropriation directly to the appropriate legislative body, without first submitting it to the Governor.

which is "referred back to the parties for further bargaining." G. L. c. 150E, § 7 (*c*).

The union contends that the defendants may play no role in this statutory bargaining scheme before the Governor makes a recommendation to the Legislature. There is no dispute that the sheriff, as the public employer, "is the sole State employer representing management at the bargaining table." *Massachusetts Probation Ass'n* v. *Commissioner of Admin.*, 370 Mass. 651, 659 (1976).[6] Thus, the union claims, the defendants unlawfully interfered with the negotiation of the collective bargaining agreement between the union and the sheriff because of their involvement in the earlier negotiations.

While we agree with the union that, "absent contrary legislative direction, we cast a cold eye on rules that would multiply the number of entities involved in the collective bargaining process," *Keane* v. *City Auditor of Boston*, 380 Mass. 201, 209 (1980), the Legislature has given the Governor effective veto power over any collective bargaining agreement that is, for whatever reason, not satisfactory. G. L. c. 150E, § 7 (*c*). See *Alliance, AFSCME/SEIU, AFL-CIO* v. *Secretary of Admin.*, 413 Mass. 377, 382 (1992) ("The Governor . . . has the power to disapprove an appropriation entirely"). Cf. *Boston Teachers Union, Local 66* v. *Boston*, *supra* at 560 (mayor's role in submitting requests for supplemental appropriations to fund collective bargaining agreement is merely "ministerial"). While the Governor does not negotiate any agreement, he has a critical role in the ultimate outcome of that process. It serves no purpose, and would needlessly prolong the collective bargaining process, to insist that the Governor remain silent as to his position. How the parties reach an agreement that is acceptable

---

[6]Several pieces of legislation establish that the sheriff is the public employer for the purposes of G. L. c. 150E, § 7 (*c*), and thus, the sole bargaining representative. Section 567 of St. 1996, c. 151, which dissolved Franklin County and relegated it to the control of the Commonwealth, provides that G. L. c. 150E, § 7 (*c*), shall continue to apply to the sheriff, as the public employer, despite the dissolution. See St. 1996, c. 151, § 567 (*p*). In 1998, the Legislature amended St. 1996, c. 151, § 576 (*o*), to reinforce the requirement that agreements with the sheriff be funded pursuant to G. L. c. 150E, § 7 (*c*), by specifically providing that "collective bargaining agreement[s] negotiated by said sheriff shall be submitted to the governor in conformity with the provisions of [G. L. c. 150E, § 7 (*c*)]." St. 1998, c. 55, § 1.

to the Governor, and how they convince the Governor that their agreement should be approved, is entirely up to the parties. However, the Governor is free to communicate his position without committing unlawful interference in the collective bargaining process.

Here the communications in question were not with the Governor, but were instigated by officials in his administration. We conclude that the Governor, as the "supreme executive magistrate," *Opinion of the Justices*, 302 Mass. 605, 618 (1939), quoting Part II, c. 2, § 1, art. 1, of the Massachusetts Constitution, may enlist aid from appropriate officials within the executive branch in connection with performing the duties conferred on him. See *Opinion of the Justices*, 368 Mass. 866, 875 (1974) (allowing Governor to create judicial nominating commission and assign it task of generating names of candidates for appointments to judiciary even though constitutional provision in question conferred nominating and appointment authority solely on Governor). This principle applies to the duty involved in this case. Thus, it is appropriate for the Governor to consult with and seek assistance from members of the EOAF in deciding whether to recommend that the Legislature fund the agreement, and it is appropriate for those members to communicate to the bargaining parties the position that the Governor will or is likely to take.

Indeed, "the [EOAF] is an executive department of the government of the Commonwealth and it serves directly under the Governor." *Massachusetts Probation Ass'n* v. *Commissioner of Admin.*, *supra* at 660. Its duties are delineated in G. L. c. 7, § 3, set forth below.[7] Additionally, "the Commissioner of Administration, who serves at the pleasure of the Governor, acts as the executive officer of the Governor in matters 'pertaining

---

[7]General Laws c. 7, § 3, provides: "The executive office for administration and finance shall serve as the principal agency of the executive department of the government of the commonwealth for the following purposes:

"(1) Developing, co-ordinating, administering and controlling the financial policies and programs of the commonwealth;

"(2) Supervising the organization and conduct of the business affairs of the departments, commissions, offices, boards, divisions, institutions and other agencies within the executive department of the government of the commonwealth;

to the financial, administrative, planning and policy co-ordinating functions and affairs of the departments, commissions, offices, boards, divisions, institutions and other agencies within the executive department of the government of the commonwealth.' " *Massachusetts Probation Ass'n* v. *Commissioner of Admin., supra,* quoting G. L. c. 7, § 4. Moreover, the division's office of employee relations specifically "oversees collective bargaining negotiations with employee unions." Massachusetts Political Almanac 350 (2001). See G. L. c. 7, § 4A. Given the role of these departments in such matters, it would be illogical for us to hold that the Governor could not enlist the aid of his subordinates prior to his receipt of any proposed agreement.

Here, the administrator, on behalf of the division, acted within his authority.[8] A reasonable inference would be that, after

---

"(3) Developing new policies and programs which will improve the organization, structure, functions, economy, efficiency, procedures, services and administrative practices of all such departments, commissions, offices, boards, divisions, institutions and other agencies."

[8] The union claims that, because the record does not indicate that the Governor directly enlisted the aid of the defendants, the "evidence demonstrates that [the administrator] acted alone or in concert with [the Secretary] to set parameters for the negotiations," which neither had authority to do. We disagree. First, as discussed below, neither *set* the bargaining limitations; the administrator merely advised the sheriff of what pay increase terms would be acceptable to the Governor. Thus, the sheriff was not, as the union contends, "divested for all practical purposes [of] his role as the public employer." Second, the lack of evidence of a direct request for assistance by the Governor does not constitute evidence that any member of the EOAF acted without consulting with the Governor in some manner. Indeed, we think the most reasonable inference to draw is that the defendants were acting at the behest of the Governor when they communicated those terms to the sheriff. However, even assuming, arguendo, that the Governor did not enlist their aid in this process, it is the province of the division to oversee collective bargaining negotiations with employee unions, and thus, the administrator would be authorized to provide such advice.

The union also asserts that, due to this dearth of evidence, the judge's finding that the Governor enlisted any member of the EOAF to aid him in the review of the collective bargaining agreement and to communicate the acceptable terms to the sheriff was clearly erroneous, and thus, his judgment should be reversed. Assuming, without deciding, that particular finding was clearly erroneous, see *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 509 (1997), *S.C.,* 428 Mass. 543 (1998), quoting *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 160 (1977) ("A finding is 'clearly erroneous'

consulting with the Governor,[9] the administrator advised the sheriff as to what terms the Governor would accept with respect to salary increases. Thereafter, he merely informed the sheriff that the pay increases contained in the signed agreement were in excess of such terms.

The administrator's conduct did not constitute unlawful interference with the negotiations. He did not prescribe actions for the sheriff to take with respect to the negotiations. He never ordered the sheriff to negotiate an agreement that was acceptable to the Secretary.[10] He was not present at any of the negotiating sessions with the union. He did not veto what he considered to be an unacceptable agreement. Rather, the Governor vetoed the agreement by not recommending appropriation to the Legislature within the forty-five day period prescribed by the statute. The administrator merely communicated the Governor's veto — which, by the inaction of the Governor, had already become effective on June 7, 1998 — in his June 23, 1998, letter to the sheriff. Thus, contrary to the union's assertion, it has not shown that the Governor "abdicate[d]" his duties under G. L. c. 150E, § 7 (*c*), to any member of the division, see *Morris* v. *Commonwealth*, 412 Mass. 861, 865 (1992); *Brown* v. *Newburyport*, 209 Mass. 259, 266 (1911), and the number of entities involved in the negotiations was not "multipl[ied]." *Keane* v. *City Auditor of Boston*, 380 Mass. 201, 209 (1980).

On the contrary, the Governor simply exercised his veto

---

only when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed' "), for the reasons set forth in this opinion, it would not affect our conclusion.

[9]It is not clear from the record whether the administrator consulted with the Governor personally or through other channels, such as the Secretary, whom the administrator serves as a "key advisor." Massachusetts Political Almanac 373 (2001). However, we draw the reasonable inference that some consultation occurred, especially given how well informed the administrator was regarding the terms acceptable to the Governor.

[10]Nor did the sheriff feel bound by the terms that the administrator had outlined. He entered into an agreement that exceeded those terms and was free to try to convince the Governor to support the differing agreement he had reached.

power inherent in G. L. c. 150E, § 7 (*c*). In so doing, he also exercised his prerogative to communicate with and elicit advice from members of his cabinet. It was well within his discretion to instruct his cabinet members to communicate the acceptable pay increase terms to the sheriff. The Governor was the decision maker, and the EOAF members involved were agents of the Governor for the purpose of communicating the Governor's views during the negotiation of the collective bargaining agreement. The EOAF members therefore appropriately acted as the Governor's proxy. Indeed, the administrator's communications to the sheriff could not have constituted an unlawful interference where the Governor had the unilateral power to veto the agreement.

Given the Governor's discretion to consult with a cabinet member about collective bargaining agreements and to have him inform the sheriff of acceptable terms for such agreements on his behalf, the division's role in the process, and the fact that the administrator's actions were advisory in nature, G. L. c. 150E was not violated, and the defendants did not unlawfully interfere with the negotiations. Accordingly, we conclude that the summary judgment ruling was appropriate.[11]

3. *The administrator's affidavit.* The union also argues that the judge erred in denying its motion to strike the administrator's affidavit, offered by the defendants, where they did not make the administrator available for a deposition as requested by the union prior to the discovery deadline. We disagree.

Contrary to the union's assertion, the defendants did not

---

[11]The dissolution statute for Franklin County differs from the dissolution statute for Hampden County and Worcester County in that the latter requires the approval of the Secretary before a collective bargaining agreement can be signed, while the dissolution statute for Franklin County does not. Compare St. 1998, c. 55, with St. 1997, c. 48, § 25. The union contends that this distinction therefore means that Franklin County is "deliberately exempted" from the prior approval requirement in the instant case. "As a general rule, an express inclusion of one thing in a statute is an implied exclusion of things not mentioned . . . ." *Trust Ins. Co.* v. *Bruce at Park Chiropractic Clinic,* 430 Mass. 607, 609 (2000). See *Police Comm'r of Boston* v. *Cecil,* 431 Mass. 410, 413 (2000). However, the requirement of receiving such approval prior to entering into the bargaining agreement was never imposed on the sheriff.

"refuse" to make the administrator available for a deposition. Rather, in spite of a lengthy series of communications, due to scheduling conflicts on both sides, the parties were unable to arrange a mutually acceptable date for his deposition. Despite the administrator's availability in October, the union decided to proceed with its summary judgment motion, and cancelled its deposition of the administrator. Cf. *Saud* v. *Fast Forward, Inc.*, 41 Mass. App. Ct. 643, 647-648 (1996) (defendants prohibited from introducing records requested by plaintiff, but not produced until trial); *Cassano* v. *Gogos*, 20 Mass. App. Ct. 348, 355 (1985) (same). Although both sides' failure to schedule a deposition of the administrator was unfortunate, the union has not shown that the defendants "engaged in a conscious strategy designed to . . . frustrate the process of the litigation." *Berube* v. *McKesson Wine & Spirits Co.*, 7 Mass. App. Ct. 426, 432 (1979).

Alternatively, the union contends that the defendants submitted the administrator's affidavit in an untimely manner, and separate from the rest of the papers that it filed in its cross motion, in contravention of Rule 9A of the Rules of the Superior Court (2001). See Rule 9A (a) (3). Thus, the union argues, the motion to strike the affidavit should have been allowed.

Certainly, it would have been preferable for the defendants to have complied with rule 9A. However, due to the administrator's preexisting scheduling conflicts, the defendants were unable to secure his affidavit by the date on which the defendants' responsive pleading was due. The defendants "made 'extensive efforts' " to secure the administrator's affidavit in order to include it with the rest of their papers. *Partlow* v. *Hertz Corp.*, 370 Mass. 787, 790 (1976), quoting *Societe Internationale Pour Participations Industrielles et Commerciales, S.A.* v. *Rogers*, 357 U.S. 197, 211 (1958). However, due to circumstances beyond their control, it was simply not possible to file the affidavit within the confines of rule 9A. Cf. *Partlow* v. *Hertz Corp.*, *supra* (no "demonstrated inability on the part of the plaintiff to comply with the orders directed to him"). The

judge's decision to consider the motion for summary judgment despite the rule 9A violation was within his discretion.[12]

*Judgment affirmed.*

---

[12]With respect to both grounds for exclusion, the affidavit's admission did not prejudice the union. The union offered nothing to support its contention that it was "manifestly harmed by its inability to cross-examine" the administrator with respect to his affidavit. First, as the defendants correctly point out, the affidavit was offered not for the purpose of resolving a disputed factual or legal issue in the case, but rather to clarify the chronology of communications between the sheriff and the division. That chronology differed in sequence, but not in substance, from the sheriff's deposition testimony. Moreover, the union incorrectly asserts that the judge reached his "findings and conclusions with respect to the actions taken by the Governor in the collective bargaining process between the union and [the sheriff] based entirely upon the statements in that affidavit." Aside from the administrator's affidavit, the record is replete with communications between the sheriff and the defendants with respect to this issue. Thus, any alleged error was harmless. See *Tosti* v. *Ayik*, 394 Mass. 482, 491 n.8 (1985). The judge did not abuse his discretion in denying the union's motion to strike the administrator's affidavit.